NANCI E. NISHIMURA (SBN 152621)
nnishimura@cpmlegal.com
JAMES G. DALLAL (SBN 277826)
jdallal@cpmlegal.com
**COTCHETT PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone:   (650) 697-6000
Facsimile:   (650) 697-0577

ROBERT B. HUTCHINSON (SBN 45367)
rhutchinson@cpmlegal.com
KELLY W. WEIL (SBN 291398)
kweil@cpmlegal.com
**COTCHETT PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

P. TERRY ANDERLINI (SBN 44783)
tanderlini@amlawoffice.com
**ANDERLINI & McSWEENEY LLP**
66 Bovet Road, Suite 285
San Mateo, California 94402
Telephone:   (650) 242-4884
Facsimile:   (650) 212-0001

*Attorneys for Plaintiff John McGhee*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN MCGHEE,** an individual,<br><br>Plaintiff,<br>v.<br><br>**CARNIVAL CORPORATION & PLC,** a Bermuda Corporation; and **PRINCESS CRUISE LINES, LTD.,** a Bermuda Corporation,<br><br>Defendants. | CASE NO:<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **NEGLIGENCE**<br>2. **GROSS NEGLIGENCE**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE CONTENTS**

**PAGE NO.**

**I. INTRODUCTION** ...................................................................... **1**

**II. THE PARTIES** ...................................................................... **4**

    A. PLAINTIFF ........................................................................ 4
    B. DEFENDANTS ................................................................. 4

**III. JURISDICTION** .................................................................. **8**

**IV. VENUE** .................................................................................. **9**

**V. FACTUAL ALLEGATIONS** ................................................ **9**

    A. THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS ............................... 9

    B. DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE *GRAND PRINCESS* IN SAN FRANCISCO .............................................. 11

    C. DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE *GRAND PRINCESS* HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO ............................. 16

    D. DESPITE KNOWING THE *GRAND PRINCESS* WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS ..................... 18

    E. DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES ................................. 19

    F. DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING ............... 21

    G. DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE ...... 24

    H. CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION ............................................................. 26

**VI. NOTICE** .............................................................................. **28**

**VII. CLAIMS** ............................................................................ **28**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

**COMPLAINT FOR DAMAGES**           i

FIRST CLAIM
NEGLIGENCE (On Behalf of PLAINTIFF JOHN MCGHEE
Against Each Defendant) ................................................................. 28

SECOND CLAIM
GROSS NEGLIGENCE
(On Behalf of PLAINTIFF JOHN MCGHEE,
Against Each Defendant) ................................................................. 34

THIRD CLAIM
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(On Behalf of PLAINTIFF JOHN MCGHEE
Against Each Defendant) ................................................................. 38

**VIII. PRAYER FOR RELIEF AND DEMAND FOR JURY ............................. 40**

PLAINTIFF **JOHN MCGHEE**, an individual (hereinafter "MR. MCGHEE" or "PLAINTIFF") brings this action for personal injuries and severe emotional distress against DEFENDANTS **PRINCESS CRUISE LINES, LTD. ("**PRINCESS**")**, and **CARNIVAL CORPORATION & PLC ("CARNIVAL")**, (collectively hereinafter "DEFENDANTS").

## I.    INTRODUCTION

1.     When MR. MCGHEE boarded the *Grand Princess* cruise ship in San Francisco, California on February 21, 2020, he had no knowledge, notice, and/or warning that he was boarding a cruise ship armed with a super virus known to be highly contagious, kill at-risk populations quickly, and have no cure—SARS-CoV-2, the novel coronavirus that causes COVID-19.

2.     Yet DEFENDANTS CARNIVAL and PRINCESS, and/or each of them and their managing agents, including Dr. Grant Tarling, the Chief Medical Officer, knew or should have known that a prior passenger on board the vessel was infected with the coronavirus and had been experiencing severe respiratory symptoms associated with COVID-19 for the past seven (7) days while traveling on the *Grand Princess*, resulting in the entire ship and crew being exposed to and potential carriers of the highly contagious and deadly virus, all immediately prior to the *Grand Princess* docking in San Francisco, California, to offload some passengers and pick up others on February 21, 2020.

3.     Yet DEFENDANTS, and/or each of them, negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of their passengers, invited and boarded MR. MCGHEE onto the deadly cruise ship armed with COVID-19 without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. DEFENDANTS, and/or each of them, also negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, failed

to disinfect, decontaminate, and/or sanitize the exposed surfaces of the cruise ship prior to boarding MR. MCGHEE and failed to administer any coronavirus tests to any prior passengers and/or crew, leaving all new passengers, including MR. MCGHEE, completely, unknowingly, and inescapably exposed to the deadly virus.

4.    DEFENDANTS, and/or each of them, had knowledge of the infectious and deadly danger posed by the Coronavirus before they allowed new passengers to board the *Grand Princess* in San Francisco on February 21, 2020, joining them with 62 prior passengers and 1,000 crew members who had traveled with and been in close contact with the infected passenger for at least seven (7) days prior.

5.    In fact, another of DEFENDANTS' cruise ships, the *Diamond Princess,* had been under quarantine at Yokohama's port near Tokyo, Japan since February 3, and as of February 20, 2020, the global press was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as 'asymptomatic pathogen carriers,' meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[1] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period *for their traveling partners and close contacts***."[2]

6.    Prior to February 21, 2020 when PLAINTIFF boarded the *Grand Princess*, COVID-19 had killed over 2,000 people and there were over 75,000 cases reported worldwide."[3]

---

[1] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi

[2] *Id.*

[3] *Id.*

7.     Dr. Tarling later reported "the company believed the virus was brought aboard the *Grand Princess* by a passenger on a previous cruise" who embarked for Mexico on February 11 and disembarked on February 21, but had reported to medical professionals on the cruise ship that he "had fallen ill around two or three days after boarding the ship."[4]   The afflicted passenger aboard the *Grand Princess* sought medical treatment from the ship's medical center on February 20, but DEFENDANTS, and/or each of them, took **no action** upon the ship's arrival back in San Francisco the following day.

8.     According to industry experts, commercial cruise ship companies make money in two ways: tickets sales and on-board purchases. While tickets represent a majority of revenue for these companies, ***onboard purchases account for the lion's share of the profit***.[5] This dynamic creates an obvious financial incentive for the officers, directors, and/or managing agents of DEFENDANTS to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket.

9.     Further, Dr. Tarling knows (and at all relevant times knew) about the virulent nature of infectious diseases.  DEFENDANT CARNIVAL touts his 27 years of experience overseeing the health and welfare of 12 million passengers annually and thousands of crew members aboard CARNIVAL'S 104 cruise ships across its nine cruise lines.  DEFENDANTS promote Dr. Tarling as a medical expert who is internationally recognized in the cruise industry for developing and implementing policies and procedures to protect global travelers:

> *Dr. Tarling is also charged with developing and implementing research-based public health policies and procedures that protect large populations of global travelers.  His expertise is routinely called upon by national and international health authorities to help develop*

---

[4] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.
[5] *Id.*

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

*prevention and control measures to mitigate the global spread of communicable diseases such as Zika, Ebola, MERS, Chikungunya, Legionella, noroviruses and novel influenza viruses.*[6]



The coronavirus-stricken Grand Princess cruise ship docked in San Francisco, Calif., on April 7, 2020.
MediaNews Group/East Bay Times v/MediaNews Group via Getty Images

## II.   **THE PARTIES**

### A.   **PLAINTIFF**

10.   Plaintiff **JOHN MCGHEE** ("MR. MCGHEE") is, and at all times relevant to this Complaint was, a resident of the County of Lincoln, State of Idaho. MR. MCGHEE was a ticketed passenger who boarded the *Grand Princess* cruise on February 21, 2020 in San Francisco.

### B.   **DEFENDANTS**

11.   Defendant **Carnival Corporation & PLC** ("CARNIVAL") is a dual-listed company operating as two fully integrated entities, Carnival Corporation and Carnival plc. Carnival Corporation was incorporated in Panama in 1972. Carnival plc was incorporated in Wales, United Kingdom in 2000. As described by CARNIVAL

---

[6] https://www.princess.com/news/notices_and_advisories/notices/dr-grant-tarling-chief-medical-officer.html

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

in a filing with the U.S. Securities and Exchange Commission (SEC), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival Plcs's Articles of Association." Carnival Corporation and Carnival plc operate as a single economic enterprise and share a senior executive management team and identical Boards of Directors. The dual-listed company has its headquarters in Miami, Florida. This lawsuit is being brought against the dual-listed company and/or Carnival Corporation (collectively, "CARNIVAL"). CARNIVAL is the owner of the *Grand Princess.*

12. Defendant **Princess Cruise Lines LTD** ("PRINCESS") is incorporated in Bermuda, with its headquarters in Santa Clarita, California. Santa Clarita serves as the nerve center for PRINCESS, and all major decisions regarding operation of its cruise ships are made with the input of PRINCESS executives whose offices are located at the PRINCESS headquarters in Santa Clarita, California.

13. According to its 2019 Annual Report, CARNIVAL is the owner of the *Grand Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[7] Under Note 2, "Significant Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment," and again later in the report.[8] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Grand Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

---

[7] Carnival Corporation & plc 2019 Annual Report, p. 7.
[8] *Id.,* pp. 10-11, 17.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

14.     At all times hereto, PRINCESS and CARNIVAL advertised, marketed, sold, and profited (directly or indirectly) from, and controlled and operated the cruise ship *Grand Princess*.



15.     CARNIVAL exerts control over PRINCESS's business and day-to-day operations as the parent company of PRINCESS, which CARNIVAL refers to as a "Carnival Brand" cruise line and part of CARNIVAL'S "portfolio of leading global, regional and national cruise brands."[10]

16.     Among the shared officers of CARNIVAL and PRINCESS is Dr. Grant Tarling, who by his own admission serves as "Senior Vice President and Chief Medical Officer" for five cruise lines owned by CARNIVAL, including PRINCESS, Carnival Cruise Line, Carnival Australia, Seabourn, and Holland America.[11] It is implausible that Dr. Tarling could function in this five-way management position absent direction and coordination by CARNIVAL. Knowledge of medical and safety risks known by PRINCESS' Chief Medical Officer (Dr. Tarling) impute knowledge of medical and safety risks to CARNIVAL'S Chief Medical Officer (Dr. Tarling).

17.     DEFENDANT CARNIVAL develops, promulgates, and enforces adequate safety standards and procedures for PRINCESS cruise lines. CARNIVAL'S

---

[9] Princess Cruises headquarters in Santa Clarita, California.
[10] Carnival Corporation & plc 2019 Annual Report, p. 1.
[11] Public LinkedIn profile of Dr. Grant Tarling, available at https://www.linkedin.com/in/grant-tarling/ (last accessed Sept. 12, 2020).

website advertises its Health, Environmental, Safety, Security, and Sustainability Policy ("HESSS Policy"), highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss." CARNIVAL placed overall responsibility for ensuring PRINCESS' compliance with CARNIVAL'S HESSS Policy in CARNIVAL'S own Chief Medical Officer, and CARNIVAL monitored and supervised PLAINTIFF' safety requirements.

18.     The decisions to suspend operations of PRINCESS cruises, and the decisions to continue operations prior to the ultimate decisions to suspend, were taken by PRINCESS President Jan Swartz with input from Dr. Tarling and under the oversight and in consultation with senior CARNIVAL leadership who had the ultimate say, including CARNIVAL President & CEO Arnold W. Donald. In prominent interviews Ms. Swartz and Mr. Donald have sought to defend the actions of PRINCESS and CARNIVAL as the pandemic crisis unfolded, thereby acknowledging their direct involvement in such decisions, and also ratifying them. CARNIVAL spokesperson Roger Frizell expressly noted that CARNIVAL did not view itself as obligated to follow CDC guidelines.[12] CARNIVAL is empowered to dictate to PRINCESS where to operate, what volume of cruises to offer or passengers to service in a given market, whether to invest in new routes, nor whether to continue or suspend services.  PRINCESS does not operate without authorization from its corporate parent, CARNIVAL.

19.     PRINCESS has also been the hardest hit of the CARNIVAL cruise lines and perhaps of all cruise lines globally by the pandemic, as PRINCESS has this year faced coronavirus outbreaks aboard the *Diamond Princess, Ruby Princess,* and *Coral*

---

[12] A. Carr & C. Palmieri, "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," *Bloomberg BusinessWeek,* April 16, 2020, available at*: https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/* (last accessed Sept. 14, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT FOR DAMAGES**

*Princess* in addition to the *Grand Princess* cruises at issue here. While over 40 cruise ships have experienced coronavirus outbreaks during the pandemic, four have been PRINCESS cruise ships, and those four include the three causing the most deaths among all cruise ships globally. As of this date, of 88 known fatalities resulting from cruise ship coronavirus outbreaks globally, 52 deaths have resulted from cruises operated by PRINCESS.[13]

20.    CARNIVAL and PRINCESS are collectively referred to herein as "DEFENDANTS."

## III.    **JURISDICTION**

21.    This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. section 1333 as the wrongdoing alleged in this Complaint arose, occurred, and/or took effect on navigable waters and bears a significant relationship to traditional maritime activity, *i.e.,* it occurred while DEFENDANTS, who engage in the commerce of luxury cruises, boarded new passengers on the *Grand Princess* cruise ship docked in the San Francisco Bay.

22.    This Court has personal jurisdiction over DEFENDANTS, as they conduct substantial business in California. Defendant CARNIVAL, by and through its subsidiary, PRINCESS, markets cruise vacations to California residents. Both maintain a headquarters in Santa Clarita, California, and employ thousands of California residents to work there. Moreover, the claims asserted herein arise from DEFENDANTS' contacts with California. Each of these facts independently is, but also all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over DEFENDANTS, and/or each of them, permissible under traditional notions of fair play and substantial justice.

---

[13] *See generally* Wikipedia page on "COVID-19 pandemic on cruise ships" and sources cited therein, available at https://en.wikipedia.org/wiki/COVID-19_pandemic_on_cruise_ships (last accessed Sept. 12, 2020) (confirming 28 fatalities among passengers aboard the Ruby Princess, 14 from the Diamond Princess, 7 from the Grand Princess, and 3 from the Coral Princess).

23.    Additionally, each of the DEFENDANTS purports to be a party to the Passage Contract, which purports to name the Central District of California as proper venue for actions against DEFENDANTS. PLAINTIFF, however, do not concede the enforceability of the Passage Contract. Nevertheless, by naming this District as a proper venue, DEFENDANTS have consented to personal jurisdiction in this District.

24.    This Court has *in rem* jurisdiction over the *Grand Princess* which has been docked or moored in the San Francisco Bay almost continuously from March 4, 2020 through April 7, 2020.  Both passenger cruises at issue herein were roundtrips that departed from and ultimately arrived in San Francisco. When PLAINTIFF initiated this action, the *Grand Princess* was last known to be traveling from Southern California to Mexico.[14]

## IV.   VENUE

25.    Venue in the Central District of California is proper under 28 U.S.C. section 1391 because DEFENDANTS are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

26.    Without conceding the enforceability of the Passage Contract, PLAINTIFF acknowledge that DEFENDANTS included in the Passage Contract a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

## V.   FACTUAL ALLEGATIONS

### A.   THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS

27.    Today's CARNIVAL grew out of Carnival Cruise Lines, a cruise line formed in 1972 by Israeli business magnate Ted Arison. Operations began with a single cruise ship, and rapidly expanded on the strength of Arison's vision of rebranding and marketing luxury cruises to a vacation option accessible to the general

---

[14] https://www.vesselfinder.com/vessels/GRAND-PRINCESS-IMO-9104005-MMSI-310327000. (Last accessed February 17. 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

public. Arison gained full control of the company in 1974.  By 1987, Carnival evolved into the industry leader and went public.

28.    Expansion continued thereafter, spurred on by major acquisitions. CARNIVAL acquired the Holland America Line in 1989, Seabourn in 1992, top European cruise line Costa Cruises in 1997, and the Cunard Line in 1998. Then in April 2003, CARNIVAL merged with P&O Princess Cruises plc, thereby bringing within the CARNIVAL corporate ambit the additional Princess, P&O Cruises, P&O Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines.

29.    CARNIVAL operates "nine cruise lines with over 102 ships, carr[ies] 12 million passengers annually, and the corporation represents 50% of the global cruise market." [15]

30.    As CARNIVAL itself acknowledges, this extraordinary degree of consolidation is not readily apparent. As stated on its website, "Carnival's unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program." [16]

31.    Based on its 2019 Annual Report, CARNIVAL is the owner of the *Grand Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets. [17] Under Note 2, "Significant Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment." [18] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public

---

[15] https://www.carnivalcorp.com/corporate-information/mission-and-history (last accessed May 4, 2020).
[16] *Id.*
[17] Carnival Corporation & plc 2019 Annual Report, p. 7.
[18] *Id.,* pp. 10-11.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

investors to invest in CARNIVAL stock. As the owner of the *Grand Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

32.     The scope of CARNIVAL's operations is massive. CARNIVAL bills itself as "the world's largest leisure travel company" and trumpets its status as "among the most profitable and financially strong in the cruise and vacation industries." In Fiscal Year 2019 CARNIVAL's operations reaped over $20.8 billion in revenue and generated nearly $3 billion in profit.[19]

33.     As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players - Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD - control[led] roughly 75% of the market."[20] "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018."

34.     "In 2011, three-quarters of the nearly 16 million cruise bookings worldwide were made from the United States, according to the industry group Cruise Lines International Association, which represents 26 cruise lines, including the world's largest, Carnival and Royal Caribbean."[21]

35.     And "[i]n 2018, 28.5m [million] passengers — the bulk of them from America — spent more than $46B [billion] on cruises globally."[22]

## B.   DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE *GRAND PRINCESS* IN SAN FRANCISCO

36.     The cruise industry has a well-documented problem with the spread of disease on board cruise ships, so much so that the United States Centers for Disease Control and Prevention (CDC) maintains a Vessel Sanitation Program to inspect cruise ships and report and track onboard viral outbreaks.

---

[19] *Id.*, p.1.
[20] https://thehustle.co/the-economics-of-cruise-ships/
[21] https://www.cnn.com/2013/02/13/opinion/walker-cruise-ships/index.html
[22] https://thehustle.co/the-economics-of-cruise-ships/

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

37. Since 1994, PRINCESS cruise ships have hosted over 50 outbreaks of norovirus and other pathogens, and other CARNIVAL lines have experienced countless others.



23

38. To assuage potential passengers' concerns about viruses on board, CARNIVAL's website also touts its Health, Environmental, Safety, Security, and Sustainability Policy, highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss." [24]

---

[23] *Grand Princess* – The Atrium - https://www.cruisecritic.com/photos/ships/grand-princess-54/member-8/36093/ (Last accessed May 15, 2020).
[24] https://www.carnivalplc.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last accessed May 1, 2020).

39.     CARNIVAL confirms this commitment on its website, offering the following assurance on a page bearing the caption, "Carnival's Commitment to Guest and Crew Health":

> *Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus). Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.*[25]

40.     CARNIVAL and PRINCESS also employ Dr. Tarling, who is touted as an expert on policies and procedures to prevent the spread of communicable diseases on CARNIVAL'S more than 100 cruise ships.  Dr. Tarling is responsible for public health concerns for CARNIVAL and PRINCESS as Group Senior Vice President and Chief Medical Officer, to serve in that capacity for both companies.  He is a medical doctor and according to the website, "earned an Executive Master of Public Health degree in Health Care Management and Policy, and Global Health certification from [UCLA]." In addition, in "2016, he was elected for a second, four-year term as Chair and Chair-Elect of the Cruise Ship Medicine Section of the American College of Emergency Physicians.   In that role, he vigorously championed best-practice healthcare guidelines that have been adopted by the Cruise Line International Association (CLIA) whose members represent 95% of the world's cruise lines." According to Dr. Tarling, the medical facilities aboard ships within the CARNIVAL family of cruise lines are not mere first-aid clinics.  "Each ship's modern medical center has a physical infrastructure that allows provision of a broad range of both

---

[25] https://www.carnival.com/health-and-sailing-updates (last accessed May 1, 2020).

ambulatory care services and inpatient hospital services, including an ICU.  It has a self-contained pharmacy, lab and imaging, which is staffed by a small physician-led clinical team."  He oversees about 800 clinical staff working at sea who are supported by about 50 staff in the U.S. between Los Angeles, Miami, and Seattle.[26]

41.   The Coronavirus now known as SARS-CoV-2 is believed to have first appeared in Wuhan, Hubei Province within the People's Republic of China in December 2019.

42.   National Geographic reported on February 18, 2020, that "[f]or most patients, COVID-19 begins and ends in their lungs, because like the flu, coronaviruses are respiratory diseases."[27] The article labeled respiratory failure as "the defining signature of severe cases."

43.   CNN reported on February 19, 2020, regarding the results of the most extensive and comprehensive study of the Coronavirus performed by China's CDC and published in *The Chinese Journal of Epidemiology* two days prior. "**It found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS**. **While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[28] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[29]

44.   On February 20, 2020, NPR reported "[m]ore than 75,000 COVID-19 cases have been confirmed worldwide, according to a disease-tracking dashboard created by the Johns Hopkins Whiting School of Engineering. The virus has killed

---

[26] https://americanhealthcareleader.com/2018/how-grant-tarling-navigates-healthcare-for-8-million-travelers/ (last accessed May 14, 2020).
[27] https://www.nationalgeographic.com/science/2020/02/here-is-what-coronavirus-does-to-the-body/#close
[28] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html
[29] *Id.*

more than 2,000 people … ."[30]   The same article reported that "[t]he number of confirmed COVID-19 cases in South Korea has doubled in just 24 hours, to 104 from 51" according to the Korea Centers for Disease Control and Prevention.

45.     Any lingering doubt about the direct and specific danger the coronavirus posed to cruise ships went away with the highly publicized outbreak aboard the *Diamond Princess,* another of DEFENDANTS' cruise ships several weeks earlier. The *Diamond Princess* had been under quarantine in Yokohama, Japan since February 3, 2020.  As of February 20, it was reported that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." At the time of that reporting, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, and **more than half that number are identified as 'asymptomatic pathogen carriers,' meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[31] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period** *for their traveling partners and close contacts*."[32]

46.     Accordingly,  the  United  States  CDC  issued  the  following  Media Statement regarding the Diamond Princess outbreak on February 18, 2020:

> *CDC believes the rate of new reports of positives new on board, especially among those without symptoms, highlights the high burden of infection on the ship and the potential for ongoing risk.*

---

[30] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[31] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[32] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi

47.     COVID-19 is far more contagious and deadly than the flu. What is understood to be the incubation period between the time a person is exposed or infected with the coronavirus until that person can test positive (but be asymptomatic) varies and has changed as the science has developed. It was earlier believed that the incubation period was 14 days.  But according to a most recent report by the CDC, "typically, a person develops symptoms **5 days after being infected**, but symptoms can appear **as early as 2 days after infection** or **as late as 14 days after infection**, and the time range can vary."[33]

48.     Nevertheless, DEFENDANTS, and/or each of them, disregarded this crucial information when knowingly faced with another likely COVID-19 positive passenger on a different cruise ship—the *Grand Princess*.

## C.     DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE *GRAND PRINCESS* HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO

49.     Prior to February 21, 2020, the *Grand Princess* had been on a roundtrip cruise from San Francisco to Mexico. The Mexico cruise departed from San Francisco on February 11, 2020, and was scheduled to return to San Francisco on February 21, 2020, when the *Grand Princess* was scheduled to off-load some passengers and on-board some new passengers, then set sail to Hawaii.

50.     Dr. Tarling admitted that a passenger aboard the earlier *Grand Princess* Mexico cruise fell ill within "two or three days" of boarding the ship, and that the timing of when the passenger's symptoms first appeared indicates he brought the coronavirus onboard when he boarded the ship on February 11, 2020. [34]  Dr. Tarling

---

[33] "Similarities and Differences between Flu and COVID-19"
https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm (last accessed September 10, 2020).
[34] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.

added that while onboard, the passenger had a "six-to-seven day history of symptoms of acute respiratory illness." [35]

51.     As a result, "The U.S. Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC.  The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish."[36]   That CARNIVAL passenger died in Placer County, California on March 4, 2020.

52.     On February 20, 2020, the infected passenger aboard the *Grand Princess* visited that cruise ship's medical center to seek treatment for symptoms including "acute respiratory distress." Medical personnel aboard the ship, as well as responsible executives at CARNIVAL and PRINCESS including Dr. Tarling, knew or should have known that the symptoms were consistent with those of passengers suffering from COVID-19 aboard the *Diamond Princess* and others infected by the coronavirus around the world, as reported widely in medical circles and the popular press.

53.     Given the highly contagious nature of SARS-CoV-2, as well as the previous experience of the outbreak then in progress aboard the *Diamond Princess,* the revelation that a passenger on the *Grand Princess* was exhibiting identical symptoms created in CARNIVAL, PRINCESS and Dr. Tarling an immediate duty to warn other passengers, isolate the passengers and the general public from an immediate threat to their health, suspend all activities of the cruise ship until such time as it could be properly disinfected and decontaminated, and report the illness to a U.S. Quarantine Station overseen by the CDC's Division of Global Migration and Quarantine (DGMQ) pursuant to 42 CFR § 71.21. The DGMQ maintains a U.S. Quarantine Station in San Francisco, the destination of the *Grand Princess.* Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded their duty and did none of those things.

---

[35] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.
[36] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

54.     Instead, on February 21, 2020, DEFENDANTS, and/or each of them, decided to disregard the deadly nature of the *Grand Princess* and its foreseeably lethal environment for passengers due to the cruise ship's exposed surfaces, prior passengers, and crew members being armed with the coronavirus, and pursue substantial profits by boarding new passengers on the *Grand Princess* for a voyage to Hawaii. Notably, 62 of the original passengers from the Mexico cruise, and over 1,000 crew members, remained aboard for the voyage to Hawaii.

**D.      DESPITE KNOWING THE *GRAND PRINCESS* WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS**

55.     CARNIVAL failed to follow its own HESSS Policy when it failed to ensure that safety precautions prior to and/or at the time of boarding passengers were implemented on the *Grand Princess.*

56.     PRINCESS failed to implement any safety precautions prior to and/or at the time of boarding passengers.

57.     CARNIVAL failed to follow its own HESSS Policy when it failed to ensure that any measures to disinfect, sanitize, and/or decontaminate were taken on the *Grand Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFF, in San Francisco.

58.     PRINCESS did not take measures to disinfect, sanitize, and/or decontaminate the *Grand Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFF, in San Francisco.

59.     DEFENDANTS, and/or each of them, failed to warn, advise, and/or provide notice to the Hawaii-bound passengers prior to and/or at the time of boarding in San Francisco on February 21, 2020, that an ill passenger suffering from symptoms consistent with COVID-19 had been aboard.

60.     CARNIVAL failed to follow its own HESSS Policy when it failed to subject any of the 62 passengers or 1,000 crew members, who had traveled on the

*Grand Princess* with the infected passenger for approximately seven days prior and who were planning to continue their trip to Hawaii with the new passengers, to any additional or enhanced medical or health screening procedures, including a coronavirus test.

61.   PRINCESS failed to subject any of the 62 passengers or 1,000 crew members, who had traveled on the Grand Princess with the infected passenger for approximately seven days prior and who were planning to continue their trip to Hawaii with the new passengers, to any additional or enhanced medical or health screening procedures, including a coronavirus test.

62.   CARNIVAL failed to follow its own HESSS Policy when it failed to ensure that passengers, including PLAINTIFF, were provided with masks at the time of boarding in San Francisco and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

63.   PRINCESS failed to provide passengers, including PLAINTIFF, with masks at the time of boarding in San Francisco and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

64.   DEFENDANTS, and/or each of them, proceeded as if everything was normal and nothing had changed, and the *Grand Princess* departed as scheduled on February 21, 2020.

**E.   DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES**

65.   As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players — Carnival Corporation & PLC, Royal Caribbean

Cruises LTD, and Norwegian Cruise Line HLD — control[led] roughly 75% of the market."[37]

66.   "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018. Cruise ships make this money through two channels: Ticket sales and onboard purchases (e.g., alcoholic drinks, casino gambling, spa treatments, art auctions, and shore excursions), which passengers pay for with pre-loaded cruise cards and chip-equipped wristbands."[38]

67.   "On average, tickets account for 62% of total revenue and onboard purchases make up the remaining 38%. **Though tickets represent a majority of revenue, *onboard purchases account for the lion's share of the profit*, according to several experts**."[39]

> **As a high fixed-cost business, a cruise ship relies on getting as many passengers as possible *on the ship*** — even at fire-sale rates. **The major cruise lines will often fill each ship to 105%-110% capacity, then upsell its captive consumers on additional services.**
>
> **"They have mastered the ability to get their hands into people's pockets and to take out every last dollar,"** says Ross A. Klein, a professor at Memorial University of Newfoundland, who has closely studied the cruise ship industry. "They can almost give a cabin away for free and still make a profit."
>
> …
>
> On average, a passenger will spend $1,060 ($151/day) on a ticket and $650 ($92/day) on onboard purchases. After subtracting overhead costs, a ship will make out with roughly $291 in net profit per passenger, per cruise.
>
> **That means that at full capacity, a single ship like Royal Caribbean's Symphony of the Seas might make $9.8m in revenue ($1.7m of which is profit) during one 7-day excursion. *That's $239k in profit per day at sea*.**[40]

---

[37] https://thehustle.co/the-economics-of-cruise-ships/
[38] *Id.*
[39] *Id.*
[40] *Id.*

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

68.     This creates an obvious financial incentive for DEFENDANTS, and/or each of them, to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket. And that is what happened here.

### F.    DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING

69.     MR. MCGHEE and his wife planned and purchased tickets for a two-week cruise to Hawaii aboard the Grand Princess on www.vacationstogo.com for $3,217.00.

70.     Per the PRINCESS Booking Confirmation, which bore the slogan "Come back new," MR. MCGHEE was immediately subject to an aggressive regime of cancellation penalties under which they would forfeit $400 from the very moment they purchased the tickets, 50% of the purchase price one week later, 75% as of January 24, 2020, and 100% as of February 7, 2020, two weeks from departure.

71.     Shortly before departure, MR. MCGHEE and his wife called PRINCESS to try and cancel the cruise.  They were told by PRINCESS that none of their money would be refunded and the cruise would be safe, so the MCGHEES moved forward with their plans to take the cruise.

72.     On February 21, 2020, MR. MCGHEE, along with his wife, boarded the *Grand Princess*.  They were the unsuspecting passengers on a doomed voyage that tragically would alter MR. MCGHEE'S life forever.  On February 21, they boarded the *Grand Princess* in San Francisco, and according to their itinerary, departed at 4:00 pm to cruise at sea through February 25, 2020.  The *Grand Princess* itinerary addressed herein is from the Princess Cruise Line website.[41]

---

[41] https://www.icruise.com/itineraries/15-night-hawaiian-islands-cruise_grand-princess_2-21-2020.html (last accessed September 10, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

73.     On February 26, 2020, at 8:00 am, the *Grand Princess* arrived at the Hawaiian island of Kauai.  From February 26 through 29, the *Grand Princess* sailed amongst the Hawaiian Islands, with additional stops on Oahu, Maui, and finally on Hawaii (the "Big Island") on the evening of February 29, 2020.

74.     On February 29, 2020, the *Grand Princess* was scheduled to depart from Hawaii at 5:00 pm, on the return voyage towards the mainland.  The ship was scheduled to be at sea from March 1 to March 4, with a stop in Ensenada, Mexico.

75.     On March 4, 2020, however, MR. MCGHEE, along with his wife, as first alerted to the virus being aboard the *Grand Princess* from a "Guest Health Advisory – Coronavirus" letter from Dr. Tarling. The letter notified passengers of potential exposure to the virus and announced that the Ensenada stop scheduled for March 5 was cancelled so the ship could return directly to San Francisco. No independent findings were reported. No mention was made of the overlapping passengers and crew from the Mexico cruise.



42

76.     On March 4, 2020, California Governor Gavin Newsom declared a state of emergency regarding the COVID-19 outbreak.  In an attempt to manage the crisis, the State of California refused to allow the *Grand Princess* to return to port as planned in San Francisco.

---

[42]https://thehill.com/changing-america/well-being/prevention-cures/486807-couple-still-on-grand-princess-cruise-files-1 (Last accessed May 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

77.     Defendants' March 4 "Health Advisory – Coronavirus" downplayed the passengers' exposure, noting that "the United States Centers for Disease Control and Prevention (CDC) that they are investigating a small cluster of COVID-19 (coronavirus) cases in Northern California connected to a *Grand Princess* voyage that sailed roundtrip from San Francisco from February 11 to February 21."  Also explicitly downplaying the exigent nature of the contagion, Dr. Tarling characterized COVID-19 as akin to the flu, stating "COVID-19 causes mild illness in about 80% of cases, typically with symptoms of fever, cough and shortness of breath, like the common cold or flu."  But he further downplayed the life-threatening and life-altering nature of COVID-19 to the rest, stating "About 20% of people develop more severe symptoms" but equated the risk factors for these "more susceptible individuals" as "those with other chronic medical condition, as it does with regular flu."  It was already known that nothing could be further from the truth as COVID-19 was contagious and deadly.

78.     From March 4 until March 9, 2020, the *Grand Princess* remained in a holding pattern in the waters off San Francisco Bay for several days of political negotiations that included input from the federal government in Washington before the *Grand Princess* was finally permitted to land in the Port of Oakland on March 9, 2020.

79.     Passengers were allowed to disembark in stages, beginning on March 9, 2020.  Passengers with symptoms disembarked first and were sent to Asilomar State Beach and Conference Grounds for treatment, while those without symptoms went to Travis Air Force Base, an hour north in Solano County, for further isolation in quarantine.

/ / /

/ / /

/ / /

/ / /


43

**G.    DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE**

80.    In the time since the *Grand Princess* departed from San Francisco for Hawaii on February 21, 2020, had to turn back to San Francisco, but allowed to finally anchor in Oakland, MR. MCGHEE was not allowed to disembark for nearly one week after being told of the onboard risk of coronavirus.

81.    Toward the end of the cruise, MR. MCGHEE became visibly infected and ill. MR. MCGHEE and his wife had to quarantine in California until they were permitted to fly home to Idaho.   At all times alleged, MR. MCGHEE and MRS. MCGHEE had only been in the company of other passengers or crew of the *Grand Princess*.  MR. MCGHEE was not exposed to COVID-19 prior to boarding the *Grand Princess*.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

43 https://news.sky.com/story/coronavirus-21-people-stranded-on-grand-princess-cruise-ship-test-positive-for-covid-19-11951315 (Last accessed May 5, 2020).



44

82.     When MR. MCGHEE contracted COVID-19, the *Grand Princess* was not on the high seas and was within three nautical miles of a United States shore.

83.     MR. MCGHEE was tested for SARS-CoV-2 on March 15, 2020.  His test reported a positive result on March 23, 202.

84.     MR. MCGHEE suffers from lasting injuries to this day, including shortness of breath that interferes with his work and daily activities.

85.     As of the date of this filing, MR. MCGHEE is still recovering from his COVID-19 symptoms, continues to suffer from fatigue, has difficulty breathing, is negatively affected in his work, and is confined to his home and farm in Idaho.

86.     On May 2, 2020, The Wall Street Journal reported that according to the U.S. Department of Health and Human Services, five people on the Hawaii *Grand Princess* cruise had died and 131 passengers tested positive for COVID-19.  County officials in California as of that date had traced five COVID-19 cases to the prior *Grand Princess* Mexico cruise, including two deaths.[45]

---

[44] http://www.mercurynews.com/2020/03/09/photos-coronavirus-stricken-grand-princess-arrive-at-port-of-oakland (Last accessed May 5, 2020)
[45] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.

87.     As a direct and proximate result of DEFENDANTS' negligence and gross negligence, MR. MCGHEE was infected with the coronavirus and suffered from COVID-19.

88.     In addition, PLAINTIFF was traumatized by the fear of developing COVID-19.  He was confined to the *Grand Princess* as the virus attacked and infected passengers throughout the ship, and thereafter were confined to California as he underwent testing and isolation in quarantine.

## H.     CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION

89.     The history of CARNIVALS' disregard of the health and welfare of their passengers has not gone unnoticed, as Congress is looking into how so many people fell ill aboard cruise ships in the present crisis and the industry's failure to contain the spread in time. On May 1, 2020, the Chair of the U.S. House of Representatives' Committee on Transportation and Infrastructure Peter DeFazio and the Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney summarized this history in a records request letter to CARNIVAL formally opening an inquiry.[46] In the words of the DeFazio-Maloney letter:

> *Norovirus and other communicable diseases are not new public health threats to the cruise line industry. In 2010, the World Health Organization (WHO) identified norovirus and influenza outbreaks as "the major public health challenges for the cruise industry." This assessment was made an entire decade before COVID-19 emerged on the world's stage. . . .*
>
> *Cruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure. "Cruise ships passengers spend prolonged periods in close proximity to other passengers and crew, facilitating the rapid spread of highly infectious agents such as influenza," the Journal of Travel Medicine reported in 2018. Today, the CDC warns: "Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between*

---

[46] Letter to Mr. Arnold W. Donald, President and CEO, Carnival Corporation & PLC, from the Committee on Transportation and Infrastructure, U.S. House of Representatives, Washington, D.C. (May 1, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

*travelers from many countries, and crew transfers between ships."*

90. Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded this crucial information and continued their operations as though nothing had changed, and despite their vaunted commitment to help aboard their ships, continued marketing their cruises largely as before. As the DeFazio-Maloney letter noted:

> *As of April 23, 2020, none of the front facing web-pages from any of Carnival's nine affiliated cruise lines , – Carnival Cruise Line, Princess Cruises, Holland America Line,15 Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard – mentioned a single word about COVID-19, coronavirus, or the precautions these cruise lines intend to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites are advertising various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.*



47

/ / /

/ / /

---

47 https://www.mercurynews.com/2020/03/10/watch-drone-footage-of-the-coronavirus-stricken-grand-princess-cruise-ship-as-passengers-disembark-at-the-port-of-oakland/ (Last accessed May 5, 2020)

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT FOR DAMAGES**

**VI.   NOTICE**

91.   Section 15(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims within six months from the date of the underlying harm before commencing litigation. PLAINTIFF are resolute that this egregiously unfair provision is unenforceable. Nevertheless, PLAINTIFF have complied with this purported requirement by providing written notice to DEFENDANTS' by overnight mail on May 21, 2020.

**VII.   CLAIMS**

**FIRST CLAIM**

**NEGLIGENCE**

**(On Behalf of PLAINTIFF JOHN MCGHEE,**

**Against Each Defendant)**

92.   PLAINTIFF incorporate herein by reference all of the allegations in this complaint.

93.   DEFENDANT PRINCESS operated the *Grand Princess* at all relevant times.  DEFENDANT PRINCESS owed a duty to protect its passengers, including PLAINTIFF, from known risks.

94.   DEFENDANT CARNIVAL owned the *Grand Princess* at all relevant times.  DEFENDANT CARNIVAL owed a duty to protect its passengers, including PLAINTIFF, from known risks.

95.   DEFENDANT CARNIVAL voluntarily undertook a direct and independent duty to develop, promulgate, and enforce adequate safety standars and procedures aboard the *Grand Princess* and protect passengers, including PLAINTIFF. CARNIVAL'S website advertises its Health, Environmental, Safety, Security, and Sustainability Policy ("HESS Policy", highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and

loss." CARNIVAL placed overall responsibility for ensuring PRINCESS' compliance with CARNIVAL'S HESS Policy in CARNIVAL'S own officer, and CARNIVAL monitored and supervised PLAINTIFF' safety requirements.

96. DEFENDANT CARNIVAL directed the manner in which PRINCESS employees and agents responded to COVID-19 outbreaks on Princess cruise ships.

97. DEFENDANT CARNIVAL knew or should have known of the actual risk of the viral contagion or novel coronavirus now known as SARS-CoV-2, and the resulting disease COVID-19, aboard PRINCESS cruise ships, particularly based on the cruise that took place immediately prior to PLAINTIFF' boarding the *Grand Princess*. DEFENDANT CARNIVAL knew or should have known that it was especially dangerous, and extreme and outrageous, to expose PLAINTIFF and other passengers to COVID-19. DEFENDANT CARNIVAL knew or should have known of the extreme risks to the health and safety, including the possibility of serious illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFF and other passengers onto the *Grand Princess* on February 21, 2020.

98. DEFENDANT PRINCESS knew or should have known of the actual risk of the viral contagion or novel coronavirus now known as SARS-CoV-2, and the resulting disease COVID-19, aboard its cruise ships, particularly based on the cruise that took place immediately prior to PLAINTIFF'S boarding the *Grand Princess*. DEFENDANT PRINCESS knew or should have known that it was especially dangerous, and extreme and outrageous, to expose PLAINTIFF and other passengers to COVID-19. DEFENDANT PRINCESS knew or should have known of the extreme risks to the health and safety, including the possibility of serious illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFF and other passengers onto the *Grand Princess* on February 21, 2020.

99. DEFENDANTS CARNIVAL and PRINCESS share the same Chief Medical Officer, Dr. Grant Tarling, who knew that cruise ships create a heightened risk of viral outbreak because of close quarters and prolonged contact among travelers.

100.   On January 30, 2020, the World Health Organization declared COVID-19 a global health emergency.

101.   In early February, the European Union released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.

102.   PLAINTIFF was a passenger aboard the *Grand Princess* when it departed from San Francisco on February 21, 2020 bound for Hawaii.   Before February 21, 2020, the *Grand Princess* has been on a roundtrip cruise from San Francisco to Mexico.   The Mexico cruise departed on February 11, 2020 and was scheduled to return to San Francisco on February 21.   At that time, the plan was for the *Grand Princess* to off-load all but 62 passengers from the Mexico cruise and then onboard the passengers for the Hawaii cruise.   The problem, however, was that some of the passengers on the Mexico cruise were infected with SARS-CoV-2, the virus which causes COVID-19.   This led to an outbreak on the *Grand Princess* which resulted in numerous individuals, including PLAINTIFF, contracting COVID-19.

103.   At least one passenger on the Mexico cruise was suffering from COVID-19 symptoms.   On February 20, an infected passenger on the Mexico cruise sought treatment at the ship's medical center for "acute respiratory distress."   At least three other passengers on the Mexico cruise also suffered from COVID-19 symptoms while on the *Grand Princess*.   DEFENDANTS CARNIVAL and PRINCESS, who shared a Chief Medical Officer, thus knew or should have known that the passengers from the Mexico cruise who also departed on the Hawaii cruise had been exposed to the virus.

104.   DEFENDANTS CARNIVAL and PRINCESS notified the *Grand Princess's* Mexico cruise passengers about their potential exposure to COVID-19 on February 25.   Thus, at least on February 25, DEFENDANTS CARNIVAL and PRINCESS had actual notice of the risk-creating condition – the presence of COVID-19 on the ship – and did not alert its current passengers including PLAINTIFF.

105.   Further, in addition to the outbreak aboard the *Grand Princess*, DEFENDANTS CARNIVAL and PRINCESS had experienced an outbreak on the *Diamond Princess*.  On February 18, the CDC issued the following statement about the Diamond Princess: "CDC believes the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and the potential for ongoing risk."

106.   Despite knowing of the risks of setting sail and boarding unknowing passengers, including PLAINTIFF, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, proceeded with the Hawaii cruise without providing appropriate warnings, without providing personal protestive equipment ("PPE"), and without taking other measures to prevent the spread of the virus.

107.   PRINCESS continued to host large public gatherings aboard the *Grand Princess* until March 4 – more than one week into the voyage.  Even on March 4, when passengers were reporting signature symptoms of COVID-19, PRINCESS continued to hold public events aboard the *Grand Princess* such as Formal Night and its associated dinner.

108.   Between February 21 and March 4 aboard the *Grand Princess*, at least one waiter came down with COVID-19 symptoms and was quarantined for a couple of days during the voyage.  When the waiter returned to work, he explained to the guests he was serving that he was still suffering from an illness that he believed to be the flu.  PRINCESS took no action to prevent this waiter from returning to work.  Further, assuming PRINCESS reported the crews' illnesses to CARNIVAL consistent with CARNIVAL'S Health, Environmental, Safety, Security, and Sustainability Policy, CARNIVAL took no action to protect passengers aboard the *Grand Princess* from the waiter's illness.

109.   DEFENDANT CARNIVAL breached its duty of care to passengers, including PLAINTIFF, when it put profits above safety by directing PRINCESS to continue boarding its ships in the face of COVID-19 threats aboard its cruise ships,

including the *Grand Princess*, and ignored taking any protective action whatsoever consistent with its stated Health, Environmental, Safety, Security, and Sustainability Policy.  DEFENDANT CARNIVAL further breached its duty of care to passengers, including PLAINTIFF, when it failed to ensure that PRINCESS was in compliance with CARNIVAL'S Health, Environmental, Safety, Security, and Sustainability Policy Policy.  DEFENDANT CARNIVAL further breached its duty of care to passengers, including PLAINTIFF, when it failed to warn of or protect against known risks aboard its vessel.

110.  DEFENDANT PRINCESS breached its duty of care to passengers, including PLAINTIFF, when it put profits above safety by boarding the *Grand Princess* Hawaii cruise on February 21, 2020 after known reports and treatment(s) aboard the ship of COVID-19 symptoms, and failed to take any protective action whatsoever to warn or protect the passengers aboard its ship.

111.  DEFENDANTS CARNIVAL and PRINCESS participate in the marketplace as common carriers. Tickets for its cruises are marketed to the general public. In addition to a vacation, as part of the contractual relationship reached between DEFENDANTS and their customers, passengers aboard DEFENDANTS' cruise ships may reasonably expect and do expect safe passage on ocean-worthy vessels free from any known or knowable dangers or perils.

112.  Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. DEFENDANTS CARNIVAL and PRINCESS, as the owners and operators of the *Grand Princess*, failed to do so here.

113.   As a direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, MR. MCGHEE was infected with the coronavirus and suffered from COVID-19. MR. MCGHEE continues to suffer from this injury both physically and emotionally.

114.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, Plaintiff MR. MCGHEE was injured in his health, strength, and activity, sustained injuries to his body and mind, all of which have caused Plaintiff great physical, mental, emotional, and nervous pain and suffering.  Plaintiff is informed and believes, and upon such information and belief alleges, that such injuries have resulted in debilitating injuries, all to his general damage in a sum according to proof.

115.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others,  hereinabove alleged, Plaintiff MR. MCGHEE was required to, and continues to, employ physicians and other health care providers to examine, treat and care for his injuries, and have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment rehabilitation and care in an amount according to proof.

116.   As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MR. MCGHEE was gainfully employed, and/or capable of gainful employment through his education, training, and/or experience. By further reason of DEFENDANTS' wrongful conduct hereinabove alleged, Plaintiff MR. MCGHEE suffered a loss of income and/or a loss of earning capacity in an amount according to proof.

117.   DEFENDANTS CARNIVAL and PRINCESS' failure to use reasonable care to prevent harm was a substantial factor in causing PLAINTIFF' harm.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CLAIM

## GROSS NEGLIGENCE

### (On Behalf of PLAINTIFF JOHN MCGHEE,

### Against Each Defendant)

118.   PLAINTIFF hereby re-allege and incorporate herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

119.   DEFENDANT PRINCESS operated the *Grand Princess* at all relevant times.  DEFENDANT PRINCESS owed a duty to protect its passengers, including PLAINTIFF, from known risks.

120.   DEFENDANT CARNIVAL owned the *Grand Princess* at all relevant times.  DEFENDANT CARNIVAL owed a duty to protect its passengers, including PLAINTIFF, from known risks.

121.   DEFENDANT CARNIVAL voluntarily undertook a direct and independent duty to develop, promulgate, and enforce adequate safety standars and procedures aboard the *Grand Princess* and protect passengers, including PLAINTIFF.  CARNIVAL'S website advertises its Health, Environmental, Safety, Security, and Sustainability Policy ("HESS Policy", highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss."   CARNIVAL placed overall responsibility for ensuring PRINCESS' compliance with CARNIVAL'S HESS Policy in CARNIVAL'S own officer, and CARNIVAL monitored and supervised PLAINTIFF' safety requirements.

122.   DEFENDANT CARNIVAL directed the manner in which PRINCESS employees and agents responded to COVID-19 outbreaks on Princess cruise ships.

123.   DEFENDANT CARNIVAL knew or should have known of the actual risk of the viral contagion or novel coronavirus now known as SARS-CoV-2, and the

resulting disease COVID-19, aboard PRINCESS cruise ships, particularly based on the cruise that took place immediately prior to PLAINTIFF' boarding the *Grand Princess*. DEFENDANT CARNIVAL knew or should have known that it was especially dangerous, and extreme and outrageous, to expose PLAINTIFF and other passengers to COVID-19. DEFENDANT CARNIVAL knew or should have known of the extreme risks to the health and safety, including the possibility of serious illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFF and other passengers onto the *Grand Princess* on February 21, 2020.

124. DEFENDANT PRINCESS knew or should have known of the actual risk of the viral contagion or novel coronavirus now known as SARS-CoV-2, and the resulting disease COVID-19, aboard its cruise ships, particularly based on the cruise that took place immediately prior to PLAINTIFF'S boarding the *Grand Princess*. DEFENDANT PRINCESS knew or should have known that it was especially dangerous, and extreme and outrageous, to expose PLAINTIFF and other passengers to COVID-19. DEFENDANT PRINCESS knew or should have known of the extreme risks to the health and safety, including the possibility of serious illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFF and other passengers onto the *Grand Princess* on February 21, 2020.

125. DEFENDANTS CARNIVAL and PRINCESS share the same Chief Medical Officer, Dr. Grant Tarling, who knew that cruise ships create a heightened risk of viral outbreak because of close quarters and prolonged contact among travelers.

126. On January 30, 2020, the World Health Organization declared COVID-19 a global health emergency.

127. In early February, the European Union released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.

128. PLAINTIFF was a passenger aboard the *Grand Princess* when it departed from San Francisco on February 21, 2020 bound for Hawaii. Before

February 21, 2020, the *Grand Princess* has been on a roundtrip cruise from San Francisco to Mexico.  The Mexico cruise departed on February 11, 2020 and was scheduled to return to San Francisco on February 21.  At that time, the plan was for the *Grand Princess* to off-load all but 62 passengers from the Mexico cruise and then onboard the passengers for the Hawaii cruise.  The problem, however, was that some of the passengers on the Mexico cruise were infected with SARS-CoV-2, the virus which causes COVID-19.  This led to an outbreak on the *Grand Princess* which resulted in numerous individuals, including PLAINTIFF, contracting COVID-19.

129.    At least one passenger on the Mexico cruise was suffering from COVID-19 symptoms.  On February 20, an infected passenger on the Mexico cruise sought treatment at the ship's medical center for "acute respiratory distress."  At least three other passengers on the Mexico cruise also suffered from COVID-19 symptoms while on the *Grand Princess*.  DEFENDANTS CARNIVAL and PRINCESS, who shared a Chief Medical Officer, thus knew or should have known that the passengers from the Mexico cruise who also departed on the Hawaii cruise had been exposed to the virus.

130.    DEFENDANTS CARNIVAL and PRINCESS notified the *Grand Princess's* Mexico cruise passengers about their potential exposure to COVID-19 on February 25.  Thus, at least on February 25, DEFENDANTS CARNIVAL and PRINCESS had actual notice of the risk-creating condition – the presence of COVID-19 on the ship – and did not alert its current passengers including PLAINTIFF.

131.    Further, in addition to the outbreak aboard the *Grand Princess*, DEFENDANTS CARNIVAL and PRINCESS had experienced an outbreak on the *Diamond Princess*.  On February 18, the CDC issued the following statement about the Diamond Princess: "CDC believes the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and the potential for ongoing risk."

132.    Despite knowing of the risks of setting sail and boarding unknowing passengers, including PLAINTIFF, DEFENDANTS CARNIVAL and PRINCESS,

1   and/or each of them, proceeded with the Hawaii cruise without providing appropriate
2   warnings, without providing personal protestive equipment ("PPE"), and without
3   taking other measures to prevent the spread of the virus.

4   133.   PRINCESS continued to host large public gatherings aboard the *Grand
5   Princess* until March 4 – more than one week into the voyage.  Even on March 4,
6   when passengers were reporting signature symptoms of COVID-19, PRINCESS
7   continued to hold public events aboard the *Grand Princess* such as Formal Night and
8   its associated dinner.

9   134.   Between February 21 and March 4 aboard the *Grand Princess*, at least
10  one waiter came down with COVID-19 symptoms and was quarantined for a couple
11  of days during the voyage.  When the waiter returned to work, he explained to the
12  guests he was serving that he was still suffering from an illness that he believed to be
13  the flu.  PRINCESS took no action to prevent this waiter from returning to work.
14  Further, assuming PRINCESS reported the crews' illnesses to CARNIVAL consistent
15  with CARNIVAL'S Health, Environmental, Safety, Security, and Sustainability
16  Policy, CARNIVAL took no action to protect passengers aboard the *Grand Princess*
17  from the waiter's illness.

18  135.   DEFENDANT CARNIVAL displayed an extreme departure from what
19  a reasonable careful company would do in the same situation to prevent harm to
20  others, including PLAINTIFF, when it put profits above safety by directing
21  PRINCESS to continue boarding its ships in the face of COVID-19 threats aboard its
22  cruise ships, including the *Grand Princess*, and ignored taking any protective action
23  whatsoever consistent with its stated Health, Environmental, Safety, Security, and
24  Sustainability Policy.

25  136.   DEFENDANT PRINCESS displayed an extreme departure from what a
26  reasonable careful company would do in the same situation to prevent harm to others,
27  including PLAINTIFF, when it put profits above safety by boarding the *Grand
28  Princess* Hawaii cruise on February 21, 2020 after known reports and treatment(s)

aboard the ship of COVID-19 symptoms, and failed to take any protective action whatsoever to protect the passengers aboard its ship.

137.   As described herein, the conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, was an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to its paying passengers.

138.   As a direct and legal result of DEFENDANTS' gross negligence as described herein, MR. MCGHEE contracted COVID-19, from which he continues to suffer from both physically and emotionally.

139.   In doing the wrongful acts as hereinabove alleged, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFF. The conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, was a substantial factor in causing PLAINTIFF' harm.  Such actions were done with malice, oppression and/or fraud and were and are despicable, shocking and offensive and entitle PLAINTIFF to an award of punitive damages against DEFENDANTS CARNIVAL and PRINCESS.

## THIRD CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (On Behalf of PLAINTIFF JOHN MCGHEE,
### Against Each Defendant)

140.   PLAINTIFF hereby re-allege and incorporate herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

141.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have

known of the extreme risks to the health and safety, including the possibility of serious illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFF and other passengers onto the *Grand Princess* on February 21, 2020.

142.   Despite having knowledge of the coronavirus pandemic and its particular threat to the safety of cruise ship passengers, DEFENDANT CARNIVAL failed to take any action to protect PLAINTIFF from the known risks abord the *Grand Princess*, failed to warn PLAINTIFF of said known risks, failed to institute any safety measures whatsoever, and ratified PRINCESS' decision to set sail on the Hawaii cruise following the Mexico cruise where multiple passengers had fallen ill to COVID-19.

143.   Despite having knowledge of the coronavirus pandemic and its particular threat to the safety of cruise ship passengers, DEFENDANT PRINCESS failed to take any action to protect PLAINTIFF from the known risks abord the *Grand Princess*, failed to warn PLAINTIFF of said known risks, failed to institute any safety measures whatsoever, and boarded PLAINTIFF on the Hawaii cruise following the Mexico cruise where multiple passengers had fallen ill to COVID-19.

144.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have known during the instant voyage aboard the *Grand Princess* that one or more passengers and/or crew were experiencing symptoms of COVID-19, but passengers were told that their illness was the flu.

145.   As described herein, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with reckless disregard of the probability that PLAINTIFF would suffer emotional distress, knowing (and profiting from the fact) that PLAINTIFF were ticketed passengers of the *Grand Princess*.

146.   As described herein, the conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees,

officers, and others, was atrocious, utterly intolerable, and so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.

147.   On March 4, PLAINTIFF was suddenly ordered to stay in his rooms for the next six (6) days and was not provided with any PPE such as sanitizer or face masks.  PLAINTIFF was frightened and anxious, with no way off the ship.

148.   As a direct and legal result of DEFENDANTS' intentional infliction of emotional distress as described herein, MR. MCGHEE suffered severe emotional distress.

149.   In doing the wrongful acts as hereinabove alleged, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFF. The conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, was a substantial factor in causing PLAINTIFF'S harm.   Such actions were done with malice, oppression and/or fraud and were and are despicable, shocking and offensive and entitle PLAINTIFF to an award of punitive damages against DEFENDANTS CARNIVAL and PRINCESS.

**VIII.    <u>PRAYER FOR RELIEF AND DEMAND FOR JURY</u>**

WHEREFORE, PLAINTIFF, on behalf of themselves and all persons similarly situated, respectfully prays that this Court grant the following relief:

1.    For compensatory and general damages in an amount according to proof;

2.    For past and future medical, incidental, and service expenses according to proof;

3.    For pre- and post-judgment interest on all damages as allowed by the law;

4.    For costs of suit incurred herein;

5.    For attorney fees under existing law;

6.    For an award of punitive damages; and

7.     For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff further demands trial by jury on all issues**.**

Dated: February 19, 2021          **COTCHETT, PITRE & McCARTHY, LLP**

By: */s/ Kelly W. Weil*
    NANCI E. NISHIMURA
    ROBERT B. HUTCHINSON
    KELLY W. WEIL
    JAMES G. DALLAL
    *Attorneys for Plaintiff*

Dated:  February 19, 2021          **ANDERLINI & McSWEENEY LLP**

By: */s/ P. Terry Anderlini*
    P. TERRY ANDERLINI
    *Attorneys for Plaintiff*